## U S WEST COMMUNICATIONS, INC. Plaintiff,

v.

TCG OREGON, a limited Partnership; Roger Hamilton, Ron Eachus, Commissioner, and Joan H. Smith, Commissioner, in their official capacities as Commissioners of the Oregon Public Utility Commissioner; and Oregon Public Utility Commission, Defendants.

Civil No. 97–858–JE.

United States District Court, D. Oregon.

Jan. 30, 1998.

Lawrence H. Reichman, Perkins Coie, Portland, OR, for Plaintiff.

Keith L. Kutler, Davis Wright Tremaine, Portland, Paul M. Gordon, Wendell H. Goddard, Gordon & Goddard, Oakland, CA, for Defendant TCG Oregon.

W. Benny Won, Timothy M. Wood, Hardy Myers, Assistant Attorneys General, Department of Justice, Salem, OR, for Defendants Oregon Public Utility Commission and Commissioners Hamilton, Eachus & Smith.

## OPINION AND ORDER

JELDERKS, United States Magistrate Judge.

Plaintiff U S West Communications, Inc. (U.S. WEST) brings this action against defendants TCG Oregon (TCG), the Oregon Public Utility Commission (PUC), and PUC Commissioners Roger Hamilton, Ron Eachus, and Joan Smith (the Commissioners). The Commission defendants move to dismiss based upon lack of subject matter jurisdiction, and TCG moves to dismiss for lack of jurisdiction and failure to state claims upon which relief may be granted. The United States of America and the Federal Communications Commission (FCC) move to intervene. I grant the FCC's motion to intervene, deny the Commissioners' motion to dismiss, and grant in part and deny in part TCG's motion to dismiss.

## BACKGROUND

### 1) Telecommunications Act of 1996

U S West has provided local telephone and exchange access service to Oregon customers for more than one hundred years. Through most of this time, U S West has had no competition in its service territories.

In February 1996, Congress enacted the Telecommunications Act of 1996 (1996 Act), Pub.L. No. 104–104, 110 Stat. 56; 47 U.S.C. § 153 *et seq.* The Act, which amends the Telecommunications Act of 1934, is designed to promote competition in local and long distance telephone markets. The Act sets out a comprehensive scheme for removing barriers to entry into these markets, and reflects a Congressional intent to promote the rapid development of competition by encouraging new entrants to build their own local telephone networks. *See* 47 U.S.C. §§ 251–253.

The Act provides for the entry of competitors through two distinct mechanisms. Under the first of these, competitors can purchase individual, "unbundled" network elements that can be combined with their own network facilities to provide services. "Loops" are an example of such unbundled elements. These are the wires and other equipment needed to connect individual telephone customers to a provider's central offices, its trunk lines, communications databases, and support systems. The second mechanism allows new competitors to purchase, at wholesale prices, an incumbent local exchange carrier's (LEC's) assembled finished services, such as residential or business telephone service, for resale. These two mechanisms allow new competitors to begin competing with existing LECs before their new completed, competing networks are in place.

The Act sets out obligations for various kinds of telecommunications service providers. Under Section 25 of the Act, incumbent LECs such as U S West are required to:

(1) negotiate in good faith to reach Agreements with new competitors under the Act;

(2) offer interconnection to competing providers at "any technically feasible point" within their network. This interconnection must be at least equal in quality to that provided by the LEC to itself, and must be provided on rates and terms that are "just, reasonable, and nondiscriminatory;"

(3) provide access to unbundled network elements at "any technically feasible point" on rates and terms that are "just, reasonable, and nondiscriminatory." "Network elements" are facilities or equipment used to provide telecommunications services. "Unbundling" refers to selling individual network elements, as opposed to aggregations of network elements;

(4) offer at wholesale rates any telecommunications service that the LEC provides at retail prices to customers who are not telecommunications carriers;

(5) provide notice of changes in the information necessary for the transmission and routing of services on the LEC's network; and

(6) provide for "collocation" of the equipment necessary for interconnection or access to unbundled elements on rates and terms that are "just reasonable, and nondiscriminatory." "Physical collocation" requires an incumbent LEC to provide the office space that its competitors need to install and operate their own equipment. "Virtual collocation" requires an incumbent LEC to dedicate to its competitors the equipment they request and to permit the competitors to interconnect with the equipment in the LEC's offices.

Under the Act, incumbent LECs are entitled to recover the costs of providing interconnection, unbundled network elements, transportation and termination of traffic, resale and collocation, and may also recover a reasonable profit. 47 U.S.C. § 252(d)(1).

Section 252 of the Act sets out a comprehensive framework for reaching Agreements between LECs and competitors. If these parties are unable to reach an Agreement resolving all of the issues covered by the Act, a party can seek mediation under § 252(a)(2). If that mediation does not produce an Agreement, a party may seek compulsory arbitration under § 252(b). State Commissions like defendant PUC are responsible for conducting arbitration, subject to certain limitations. A Commission may reject an Agreement, or a portion of an Agreement, that has been reached through arbitration if it finds that the agreement does not comply with the requirements of § 251 and any FCC regulations in effect under that section, or with the standards set out in § 252(d).

The Act provides for federal district court review of interconnection agreements concluded pursuant to § 252. Section 252(e)(6) provides that, if a state commission "makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate federal district court to determine whether the Agreement...meets the requirements of the Act."

The Act also allows states to decline to carry out the regulatory roles set out above. Section 252(e)(5) provides that

If a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the Commission [FCC] shall issue an order preempting the State Commission's jurisdiction of that proceeding or matter within 90 days after being notified (or taking notice) of such failure, and shall assume the responsibility of the State commission under this Section with respect to the proceeding or matter and act for the commission

47 U.S.C. § 252(e)(5). If a state does not act, FCC proceedings and any judicial review of the FCC's action provide the exclusive remedies. 47 U.S.C. § 252(e)(6). The Act precludes state court review of interconnection agreements arbitrated under the Act. 47 U.S.C. § 252(e)(4). Section 252(e)(3) provides that

"nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an [interconnection] Agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements."

2) *Arbitration Giving Rise to this Action*

TCG requested interconnection and related network elements from U S West in February 1996. U S West and TCG were unable to resolve all of the issues related to that request, and TCG filed a petition with the PUC for arbitration pursuant to § 252(b). Arbitration was conducted in October 1996.

In a decision issued on November 8, 1996, the arbitrator resolved certain issues, and required the parties to submit a contract in accordance with the decision. U S West filed its Exceptions to the arbitrator's decision, objecting to the provisions complained of in the present action, on November 18, 1996. TCG also filed its comments on the Arbitrator's decision and requested the Commissioners' approval of the arbitration order. The

Commissioners and the PUC approved and adopted the arbitration order on December 9, 1996.

U S West petitioned for reconsideration of the Commission decision approving the arbitration decision on February 7, 1997. The Commissioners and the PUC denied that petition in an Order dated April 7, 1997.

The parties filed a copy of the interconnection agreement executed pursuant to the arbitration on May 1, 1997. The Commissioners and the PUC issued an Order on May 19, 1997, approving the executed interconnection agreement.

3) *Claims and Relief Sought.*

U S West alleges that it will suffer irreparable harm, and lose millions of dollars, if it is required to provide services at the prices set out in the Agreement ordered by the PUC. U S West's first claim for relief alleges that the Agreement imposes below-cost pricing in violation of 47 U.S.C. §§ 251(c) and 252(d). In this claim, U S West challenges the price assigned for unbundled network elements, the price allotted for physical collocation, and the wholesale discount rates and application of that discount to already discounted, volume, wholesale rates. It also challenges provisions of the Agreement requiring it to offer residential service for resale at a wholesale discount, provisions requiring application of a wholesale discount to the nonrecurring charge assessed to retail customers when TCG purchases services for resale to retail customers, and provisions requiring it to provide transport and termination services on a "bill-and-keep" basis. Finally, this count alleges that the Agreement unlawfully requires U S West to provide network interconnection without "just and reasonable compensation," and fails to adequately compensate U S West for sharing space in its conduits.

U S West's second claim alleges that the "sham unbundling" provision in the Agreement violates 47 U.S.C. §§ 251(c), 252(d), and 271(e)(1) by requiring it to provide "reaggregated unbundled elements far below cost...." U S West alleges that the Agreement allows TCG to engage in "rate arbitrage" by allowing it to purchase separate network elements needed to form a network below the wholesale rate for the identical services sold in a "finished state."

U S West's third claim alleges that the Agreement violates 47 U.S.C. § 251(c)(2)(C) by requiring it to meet specific performance standards that exceed the quality of service that U S West provides to itself.

U S West's fourth claim alleges that the Agreement violates 47 U.S.C. §§ 251(b)(4) and 252(c) by requiring it to make available deregulated or unregulated services, by imposing resale of deregulated services and application of wholesale discounts to nonrecurring charges, and by imposing liquidated damages provisions in connection with the Agreement. U S West alleges that, in imposing these requirements, the Commission defendants exceeded their authority under the Act.

U S West's fifth claim alleges that the Agreement violates 47 U.S.C. §§ 251(b)(2) and 251(e)(2) by requiring it to absorb costs it cannot recover from TCG or other telecommunications providers for providing number portability.

U S West's sixth claim alleges that the Agreement violates 47 U.S.C. §§ 251(c)(6) by requiring it to offer collocation at points that are not reasonably necessary for interconnection or for access to unbundled elements.

U S West's seventh claim alleges that the Agreement violates the Fourteenth Amendment to the United States Constitution by depriving it of property without due process of law.

U S West's eighth claim alleges that the Agreement violates the Fifth and Fourteenth Amendments to the United States Constitution by taking private property for a public use without just compensation.

U S West asks this court to enter an order declaring that the various provisions of the Agreement challenged in its claims violate the Act. In the alternative, if the court finds that the Agreement does not violate the Act, U S West seeks a declaration that the arbitration proceedings and related orders denied it of due process in violation of the 14th Amendment, and constituted a taking of

property without just compensation in violation of the 5th and 14th Amendments.

U S West also seeks a judgment declaring that it is not required to interconnect with TCG "unless and until it is fully compensated for the costs of interconnecting. . . ." It seeks further injunctive relief prohibiting defendants from taking any action to put the Agreement into effect or to enforce the Agreement, and seeks an order remanding this action to the Commissioners and the PUC for further proceedings consistent with the declarations that it seeks.

### 4) Motions Before the Court

The United States and the FCC move to intervene, and have filed a memorandum in opposition to the PUC's and the Commissioners' motion to dismiss. The PUC and the Commissioners move to dismiss on the grounds that this court lacks subject matter jurisdiction because this action cannot be brought against them in federal court. TCG moves to dismiss all but the third claim for lack of subject matter jurisdiction and failure to state claims upon which relief may be granted.

### STANDARDS

#### 1) Failure to State a Claim

■■ In evaluating a motion to dismiss for failure to state a claim pursuant to Fed. R.Civ.P. 12(b)(6), the court must accept the allegations of material fact as true, and must construe those allegations in the light most favorable to the non-moving party. *Parks Sch. of Business v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995). A claim should be dismissed only if it appears beyond doubt that the plaintiff can establish no set of facts under which relief could be granted. *Jacobson v. Hughes Aircraft Co.*, 105 F.3d 1288, 1292 (1997) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

#### 2) Jurisdiction

■ Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of actions over which the district court lacks subject matter jurisdiction. The party attempting to invoke the court's jurisdiction has the burden of establishing that the court has subject matter jurisdiction.

### DISCUSSION

#### 1) Motion to Intervene by FCC and United States

The United States and the FCC contend that they are entitled to intervene under Fed.R.Civ.P. 24(a), 28 U.S.C. § 2403, and 28 U.S.C. § 517. Alternatively, they assert that leave to intervene should be granted under Rule 24(b). Rule 24(a) provides that intervention shall be permitted when a United States statute confers a right of intervention, or when the party seeking to intervene claims an interest "relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." In actions in which "the constitutionality of any Act of congress affecting the public interest is drawn in question," 28 U.S.C. § 2403(a) requires federal courts to allow the United States to intervene "for argument on the question of constitutionality." Under 28 U.S.C. § 517,

> [t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States . . . or to attend to any other interest of the United States.

Rule 24(b)(2) provides that intervention may be permitted "when an applicant's claim or defense and the main action have a question of law or fact in common."

■ In the present action, the Commission defendants have challenged the constitutionality of the judicial review provided for under the Act. The United States and the FCC have an obvious interest in the interpretation and enforcement of the Act, and have timely sought to intervene in this action. The interests of these intervenors are not necessarily the same as those of any other parties, and it appears that none of the original parties will necessarily represent their interests adequately. I therefore grant the motion to intervene.

2) *PUC's and Commissioners' Motion to Dismiss for Lack of Subject Matter Jurisdiction*

The PUC and the Commissioners contend that this court lacks subject matter jurisdiction for several reasons. I will address these issues in the order presented in these parties' opening memorandum.

a) *Contention that the action is barred by the Eleventh Amendment*

i) *Action against PUC*

█ The Commission defendants contend that the Eleventh Amendment to the United States Constitution bars the prosecution of this action against them in federal court. That amendment provides that

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

State immunity under the Eleventh Amendment extends to state agencies such as the PUC, and to state officials such as the defendant commissioners who act on the state's behalf and who can assert a state's sovereign immunity. *See Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 142–46, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993).

█ Though the Eleventh Amendment generally bars federal jurisdiction over actions brought against states, a state may waive that immunity by a statutory or constitutional provision. *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238 n. 1, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). Participation in a federal program may also constitute a waiver of Eleventh Amendment immunity. *Premo v. Martin,* 119 F.3d 764, 770–71 (9th Cir.1997).

As noted above, the Act allows state commissions such as the PUC to participate in the arbitration of interconnection agreements, or to decline participation. If a state commission does not conduct arbitrations and assume other responsibilities under Section 252 of the Act, the FCC preempts the state commission's jurisdiction. If a state commission chooses to exercise its regulatory authority, the Act clearly provides for judicial review of the relevant interconnection agreements resulting from the process.

█ Though Congress cannot compel states to participate in federal programs or require states to govern according to Congressional instructions, it can encourage states to regulate in a particular manner by offering states the choice of regulating according to federal standards or having state law preempted by federal regulation. *New York v. U.S.,* 505 U.S. 144, 162, 167, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). The United States Supreme Court has concluded that a state's waiver of Eleventh Amendment immunity may be evidenced "'by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Port Authority Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 305, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990) (quoting *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)).

█ U S West, the United States, and the FCC contend that, by voluntarily participating in the regulatory process, Oregon has waived its immunity from the jurisdiction of this district court. Like several other federal district courts that have recently addressed this issue, I agree. *See U S West Communications, Inc. v. Thoms,* No. 4:97–CV–70082, 1997 WL 880744 (S.D.Iowa, Mar.17, 1997); *U S West Communications, Inc. v. Reinbold,* No. A1–97–25 (D.N.D. July 28, 1997); *U S West Communications, Inc. v. TCG Seattle,* 971 F.Supp. 1365, 1997 WL 426278 (W.D.Wash. July 24, 1997); *GTE South, Inc. v. Morrison,* No. 3:97CV493, slip op. (E.D.Va. Nov. 7, 1997). The clear implication to be drawn from the statutory scheme at issue here is that Congress conditioned state participation in the negotiation, arbitration, and approval process on consent to federal judicial review of the resulting agreements. States are not required to participate, but if they choose to, the Act makes clear that their regulatory decisions will ultimately be subject to review by federal courts. In the absence of any other reasonable construction of the statute, I can only conclude that, acting through the Commission defendants, Oregon waived the immuni-

ty from federal jurisdiction otherwise provided by the Eleventh Amendment.

ii) *Action against individual commissioners*

 Even if I concluded that Oregon had not otherwise waived its Eleventh Amendment immunity, based on my understanding of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), I would deny the motion to dismiss as to the individual defendant commissioners. In *Young,* the United States Supreme Court held that, though the Eleventh Amendment barred actions in federal courts against the states themselves, it did not bar such actions seeking injunctive relief against state officers who are alleged to have acted in violation of rights secured under the United States Constitution. This principle applies to federal statutes as well as to the federal Constitution, *see, e.g., Natural Resources Defense Council v. California Dep't of Transp.,* 96 F.3d 420, 422 (9th Cir.1996), and is based on the premise that federal court authority to enjoin "continuing violation of federal law [is] necessary to vindicate the federal interest in assuring the supremacy of that law." *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). Under this principle, federal courts "may enjoin state officials to conform their future conduct to the requirements of federal law...." *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

The Commission defendants contend that the *Young* doctrine does not apply to the present action because the PUC has been named as a defendant, because the individual commissioners are not authorized to act individually, because the relief sought is not strictly limited to "prospective injunctive relief," and because the action does not raise issues that are "reasonably free from doubt." I have reviewed these arguments and the responses of U S West and the intervenors carefully. I will not set out my analysis of those arguments here, but simply note that I find them unpersuasive. First, U S West brings this action against the PUC on the grounds that the State has waived its Eleventh Amendment immunity, not on the basis of the *Young* doctrine which applies to the individual commissioners. Second, that the

individual commissioners cannot act individually does not make an action against them an action against the state that is beyond the scope of the *Young* doctrine; numerous courts have permitted actions against individual officials to go forward under that doctrine even though an action could not be brought directly against the state agency by whom the officials were employed. *See, e.g., Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *Capitol Industries–EMI, Inc. v. Bennett,* 681 F.2d 1107, 1120 (9th Cir.), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 655 (1982); *W. Birkenfeld Trust v. Bailey,* 827 F.Supp. 651, 657 (E.D.Wash.1993). Third, that U S West seeks review of the PUC's "past actions" does not render this an action seeking more than prospective relief. In actions to which the *Young* doctrine applies, plaintiffs typically seek injunctive relief against application of decisions that state officials have already made. Finally, though the *Young* Court did state that the doctrine set out in that action should apply where the issue is "reasonably free from doubt," neither that decision or the many subsequent decisions applying the doctrine held that federal jurisdiction is appropriate only when it is reasonably certain that the plaintiff will prevail.

 I conclude that the *Young* doctrine does not bar the prosecution of the present action against the individual commissioners. U S West alleges that the commissioners have violated federal law in the manner in which they have set the rates and terms of the telephone service interconnection, seek only prospective relief, and do not seek monetary relief from the State of Oregon through the PUC or the individual commissioners. The action appears to be clearly within the scope of the *Young* doctrine.

b) *Contention that the action is barred by the Johnson Act, 28 U.S.C. § 1342*

The Commission defendants contend that the Johnson Act, 28 U.S.C. § 1342, renders U S West's "42 U.S.C. § 1983 and constitutional claims" outside the scope of this court's jurisdiction. That Act provides that

The district court shall not enjoin, suspend or restrain the operation of, or compliance

with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate making body of a State political subdivision, where:

(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

(2) The order does not interfere with interstate commerce; and

(3) The order has been made after reasonable notice and hearing; and

(4) A plain, speedy, and efficient remedy may be had in the courts of such State.

■ The Johnson Act precludes federal jurisdiction only when all of the conditions set out in 28 U.S.C. § 1342 are satisfied. *Hawaiian Tel. Co. v. Public Util. Comm'n,* 827 F.2d 1264, 1273 (9th Cir.1987), *cert. denied,* 487 U.S. 1218, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988).

■ Here, U S West's action is neither based exclusively on diversity jurisdiction or alleged "repugnance" to the Federal Constitution, nor are all of the other conditions required for application of the Johnson Act met. For example, U S West is not seeking to enjoin or restrain the operation of any PUC rate order, but instead challenges the terms and conditions of a private interconnection agreement approved pursuant to a federal Act. Even if the conditions were otherwise satisfied, I would conclude that the Johnson Act is inapplicable here because the Telecommunications Act, which provides a specific statutory statement of jurisdiction, is not displaced by the more general terms of the earlier Johnson Act. *See Brown v. General Serv. Admin.,* 425 U.S. 820, 834, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976).

c) *Contention that the Act violates Tenth Amendment and Guarantee Clause*

The Commission defendants contend that this action is barred by the 10th Amendment and the Guarantee Clause, Article IV, § 4 of the United States Constitution. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The Guarantee Clause provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government..."

The Commission defendants argue that these provisions are violated by Section 252(e)(6) of the Act, which provides for federal court review of state commission determinations concerning interconnection agreements, and Section 252(e)(4) of the Act, which prohibits state court review of these determinations. They assert that, in enacting the Telecommunications Act of 1996, Congress did not have the authority to "compel" states to choose between exercising their rights under the Tenth Amendment to regulate intrastate telecommunications matters (and risking loss of their Eleventh Amendment Immunity) or retaining their Eleventh Amendment immunity and abandoning their "sovereign rights to regulate intrastate telecommunications matters to the FCC by operation of 47 U.S.C. § 252(e)(5)." The Commission defendants contend that the Act unlawfully compels states to administer a federal regulatory program, and argue that the Act's prohibition on state court review of PUC determinations concerning interconnections is inconsistent with the division between state and federal authority set out in the Constitution. They also assert that, because Congress has no authority to abrogate state sovereign authority under the Commerce Clause of Article I, it lacked the lawful authority to "make the waiver of state sovereign immunity a condition to the state's action...."

■ Based upon my review of the relevant cases cited by the parties, I conclude that the statutory scheme at issue here does not violate the Tenth Amendment, the Guarantee Clause, or the dual sovereignty of federal and state government established by the Constitution. Before turning to the Tenth Amendment issue, I note that the Commission defendants do not identify how the Act purports to deny states the republican form of government specified under the Guarantee Clause. Claims brought under that clause are generally considered to be nonjusticiable. *State of California v. United States,* 104 F.3d 1086, 1091 (9th Cir.1997). Even assuming that the issue is justiciable here, the United

States Supreme Court has noted that, if the legislation in question offers states a legitimate choice rather than subjects states to an "unavoidable command," states are able to set their own legislative agendas and state officials remain accountable to a local electorate. *New York*, 505 U.S. at 185–186, 112 S.Ct. 2408.

Under the Commerce Clause, Congress has the authority to regulate activity that, though "purely intrastate in character...combined with like conduct by others similarly situated, affects commerce among the States...." *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 276, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (quoting *Fry v. United States*, 421 U.S. 542, 547, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975)). The Tenth Amendment prohibits Congress from requiring states to administer federal programs against their will. *Printz v. United States*, 521 U.S. 98, 117 S.Ct. 2365, 2383, 138 L.Ed.2d 914 (1997); *New York*, 505 U.S. at 178, 112 S.Ct. 2408. However, when Congress has the authority to regulate private activity pursuant to the Commerce Clause, the Tenth Amendment does not prohibit it from offering states the choice of either regulating that activity according to the standards it establishes, "or having state law preempted by federal legislation." *New York*, 505 U.S. at 167, 112 S.Ct. 2408. Though Congress may not compel a state to enact any particular legislation, it may induce a state to participate in a regulatory scheme by conditioning the state's receipt of federal funds on taking prescribed action. *Id.*

In *New York*, the Court considered a challenge to three provisions of the federal Low-Level Radioactive Waste Policy Amendments Act of 1985, which offered states incentives to address waste disposal issues. The Court found that two of the provisions, which left the states free to choose whether or not to participate, were constitutional. *New York*, 505 U.S. at 173–174, 112 S.Ct. 2408. It held that a third provision requiring states to either regulate in conformance with federal regulation or to assume title to and liability for radioactive waste generated within their borders constituted an unlawful coercion. *Id.* at 175, 112 S.Ct. 2408.

In *Printz*, the Court struck a section of the Brady Handgun Violence Prevention Act requiring local officials to conduct background checks before allowing the purchase of handguns. *Printz*, 117 S.Ct. at 2383.

In *Hodel*, the Court considered a challenge to legislation that offered states the opportunity to develop a regulatory program consistent with federal standards, and provided for federal regulation if a state chose not to participate. *Hodel*, 452 U.S. at 288–89, 101 S.Ct. 2352. Though it noted that the legislation limited the states' legislative choices concerning important issues, the Court concluded that the statute was not constitutionally infirm. *Id.* at 290, 101 S.Ct. 2352.

In *FERC v. Mississippi*, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982), the Court rejected a challenge to federal legislation requiring state PUCs to consider certain federal standards concerning energy rates and regulation, but not requiring the states to adopt or enforce federal standards. The Court found that this legislation did not violate the Tenth Amendment. *Id.* at 764, 102 S.Ct. 2126.

In the present action, the Commission defendants challenge federal legislation that allows states to choose whether or not to participate in the federal regulatory scheme. Under the guidance of the above decisions, I conclude that this legislation does not violate the Tenth Amendment. It appears that Congress can confer the authority to review these complex agreements upon federal courts without offending the Constitutional or statutory provisions upon which the Commission defendants rely. I therefore deny the motion to dismiss for lack of subject matter jurisdiction.

d) *Contention that U S West seeks relief that is beyond the scope of judicial review authorized under the Act*

The Act provides that an aggrieved party may bring an action in federal court "to determine whether the Agreement...meets the requirements" of Sections 251 and 252. 47 U.S.C. § 252(e)(6). The Commission defendants contend that the court lacks jurisdiction to provide these remedies because U S West "seeks, among other things, declara-

tory and injunctive relief under statutes besides 47 U.S.C. § 252(e)(6)."

At this stage in the proceedings, it is not necessary to determine what particular remedies might be available if U S West ultimately establishes that the Agreement in question does not comply with the requirements of the Act. Regardless of what other remedies U S West is seeking, it clearly seeks review of the Agreement as provided under the Act. This court has subject matter jurisdiction.

3) *TCG'S Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim*

a) *Motion to Dismiss Claim I*

As noted above, U S West's first claim alleges that the interim rates set out in the Agreement violate the Act because they will not fully compensate it for the related costs. TCG contends that the court lacks subject matter jurisdiction over the first claim because it is not ripe for review. TCG argues that the rates at issue are not reviewable because they are only "interim rates," and the PUC has made no reviewable "final determination" as to what compensation U S West will ultimately receive.

 In determining whether a particular agency decision is "ripe" for review, courts generally consider whether the challenged action constitutes a "final agency action," whether the issues presented are of a legal or factual nature, whether the challenged action has or will directly and immediately affect the party seeking review, and whether resolution of the issue will foster effective administration. *Abbot Labs. v. Gardner,* 387 U.S. 136, 149–154, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). In the present action, U S West has alleged facts that satisfy this test. U S West has alleged that it has executed a final binding agreement setting out the terms of interconnection with TCG based upon the PUC orders at issue, and that these orders require it to provide certain services and facilities at prices that will not allow it to recover its costs. In opposing TCG's motion to dismiss, U S West contends that the Commission defendants have heard the issues and arguments the parties have raised regarding the arbitrator's decision,

have resolved those issues in a manner that is to U S West's detriment, and that these defendants "will not revisit these issues...." I am satisfied that, though identified as "interim," the rates at issue here are sufficiently "final" to warrant judicial review. I therefore deny the motion to dismiss the first claim.

 In its challenge to the first claim, TCG also contends that U S West can attack the rates only if the overall impact of the rates is confiscatory, and that U S West cannot challenge individual elements of the overall rate structure. In support of that contention, TCG cites *Duquesne Light Co. v. Barasch,* 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989). Though a superficial reading of that decision offers some support for TCG's contention that a review must consider the "total effect" of the rates at issue, it is not clear the decision is truly relevant to the present action. U S West correctly notes that the Act itself specifies that costs for interconnection and network elements must be determined "without reference to a rate-of-return or other rate-based proceedings." 47 U.S.C. § 252(d)(1)(A)(i). In addition, as U S West also observes, *Duquesne Light* and related decisions addressed rate setting in the context of regulated monopolies, not the kind of "regulated-competition paradigm imposed by the Act." Under these circumstances, I will not dismiss U S West's challenge to the rates imposed under the Agreement on the grounds that it fails to address the overall impact of the rates.

b) *Motion to dismiss claim VIII*

The eighth claim alleges that the Agreement violates the Fifth and Fourteenth Amendments to the United States Constitution by taking private property for a public use without just compensation. TCG contends that this claim is not ripe for review because U S West has not sought compensation from the state for the alleged failure to justly compensate it for the services and facilities it must provide under the Agreement.

 In support of this contention, TCG relies primarily upon decisions concerning takings related to condemnations and land

use issues. *See Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); *Broughton Lumber Co. v. Columbia River Gorge Comm'n*, 975 F.2d 616 (9th Cir. 1992), *cert. denied*, 510 U.S. 813, 114 S.Ct. 60, 126 L.Ed.2d 30 (1993); *Dodd v. Hood River County*, 59 F.3d 852 (9th Cir.1995). Based upon my review of these decisions, I conclude that U S West is not required to seek compensation from the State before asserting this "failure to compensate" claim. The *Williamson* Court concluded that a takings claim concerning land use was not ripe until the government entity charged with implementing zoning regulations had reached a final decision regarding a developer's application, and that a takings claim was not ripe because the developer did not seek compensation through procedures the state had established for that purpose. *Williamson County*, 473 U.S. at 190, 194, 105 S.Ct. 3108. In the present action, unlike the situation at issue in *Williamson County*, there appears to be no other state entity or agency like a Zoning Board of Appeals to which U S West can appeal for relief from the provisions of the Agreement of which it complains.

The *Dodd* decision is more helpful in analyzing the current motions. In *Dodd*, the court held that a plaintiff was not required to present taking claims to the state court system before seeking relief in federal court. *Dodd*, 59 F.3d at 860. The court interpreted the principal concern of *Williamson County* as being whether future, uncertain or contingent events might alter the anticipated outcome. *Id.* The court added that "to hold that a taking plaintiff must first present a Fifth Amendment claim to a state court system as a condition precedent to seeking relief in a federal court would be to deny a federal forum to every taking claim." *Id.*

In the present action, it appears that U S West cannot appeal the provisions of the Agreement of which it complains to any state agency or board. TCG's contention that U S West may seek relief from the PUC by requesting a rate increase pursuant to certain Oregon statutes is not convincing, given that the Act explicitly precludes state court review of challenges to agreements such as the one at issue here, and confers review upon federal district courts. Under these circumstances, I am satisfied the conclusion that U S West must pursue further relief in state proceedings before asserting its taking claim in this court is not inevitable. Therefore, U S West's eighth claim should not be dismissed at this time.[1]

### c) *Motion to dismiss second claim*

U S West's second claim alleges that a "sham Unbundling" provision in the Agreement allows TCG to purchase the separate network elements needed to form a network at a price that is lower than the wholesale rate for the same services purchased as a unit. U S West alleges that the Agreement allows TCG to purchase "unbundled" elements at cost and then "pretend" to recombine the elements into a "finished service."

TCG contends that the Eighth Circuit's decision *Iowa Utilities Board v. Federal Communications Comm'n*, 120 F.3d 753 (8th Cir.1997) "removes all doubt that [this claim] is legally invalid." In that decision, the court concluded that the Act permitted competing carriers to obtain the ability to provide "finished telecommunications services" entirely through access to unbundled elements on an incumbent LEC's network. *Id.* at 815.

U S West agrees that the Eighth Circuit held that a requesting carrier may gain access to all of the unbundled elements needed to provide a finished service. It argues, however, that it is not complaining of this, but of provisions in the Agreement allowing TCG to require U S West to both "disaggregate" its network elements, and then to "reaggregate" these elements into a finished service for TCG. U S West cites the Eighth Circuit's conclusion that the Act does not require incumbent LECs to actually combine the unbundled elements, but instead provides that "the requesting carriers will combine

---

1. I note that the Honorable William Dwyer has recently granted motions for summary judgment on U.S. West's takings claim in similar actions brought in Washington. *U.S. West Communications, Inc. v. TCG Seattle*, C97–354WD, Order at 10 (W.D.Wash. Jan. 22, 1998); *U.S. West Communications, Inc. v. MFS Intelenet, Inc.*, C97–222WD, Order at 10 (W.D.Wash. Jan. 22, 1998). I will revisit this issue in the present action if motions for summary judgment are filed.

the unbundled elements themselves. . . ." *Id.* at 813.

■ In its reply memorandum, TCG contends that U S West has recharacterized its allegations in an attempt to conform to the holding in *Iowa Utilities Board,* and that this recharacterization is futile because the Agreement does not require U S West to perform the recombination of which it now purportedly complains. At this stage in the proceedings, I have not attempted to fully comprehend the various provisions of the Agreement, and to understand the ramifications of each particular portion on the agreement as a whole. Accepting U S West's allegations as true, and construing those allegations in its favor as I must, I cannot now conclude that U S West cannot establish any set of facts entitling it to relief on this claim. I therefore deny the motion to dismiss this claim.

d) *Motion to dismiss fourth claim*

U S West's fourth claim alleges that the Commission exceeded its authority by requiring U S West to make deregulated telecommunications services available for resale, by applying wholesale discounts to nonrecurring charges, and by including a liquidated damages provision in the agreement.

1) *Requirement to make deregulated services available*

U S West contends that the Act did not delegate to the Commission defendants the authority to require it to offer for resale any services other than those included in *retail tariffs* already in existence. U S West argues the PUC could not require it to make its *deregulated* services available to TCG, and that Oregon has not granted the PUC authority over such services.

■ These contentions appear to conflict with the plain language of the Act. Section 251(c)(4)(A) provides that LECs like U S West must "offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers." This provision neither states, nor appears to imply, any exception as to deregulated services. I therefore grant the motion to dismiss this portion of U S West's action.

2) *Requirement that wholesale discounts be applied to nonrecurring charges*

Nonrecurring charges are one-time fees imposed for establishing particular services, such as the charge a customer pays to have telephone service established. U S West contends that the Commission defendants lacked the authority to impose wholesale discounts on nonrecurring charges because these charges are not "telecommunications services" within the meaning of the Act. It also contends that imposing wholesale discounts on these services is improper because nonrecurring charges "are typically set at cost to begin with, and typically do not include costs that can be avoided."

■ I find no distinction in the Act between recurring and nonrecurring charges, and no implication that Congress intended that these charges be treated differently. U S West's observation that "a nonrecurring charge is not a telecommunications service" is both undoubtedly correct, and unavailing. Recurrent charges likewise do not constitute "telecommunications service," but there is no doubt that these charges must be provided at a discount pursuant to the Act. I therefore grant the motion to dismiss this portion of the fourth claim.

3) *Commission's authority to include a liquidated damages provision in the Agreement*

U S West alleges that the Commission defendants exceeded their authority by including provisions in the Agreement requiring it to comply with performance standards "that exceed its own internal practices and the requirements of Oregon law, and impos[ing] liquidated damages for failure to meet those standards, in violation of the law."

■ Section 251(c)(2)(C) of the Act requires incumbent LECs to provide interconnection "that is at least equal in quality to that provided by the local exchange carrier to itself." In *Iowa Utilities Board,* the Eighth Circuit concluded that this provision does not require incumbent LECs like U S West to provide competitors with interconnection at levels of quality that are superior

to those at which the incumbent LECs provide these services to themselves. *Iowa Utilities Bd.,* 120 F.3d at 813. Under the plain language of the Act itself, and the *Iowa Utilities Board* decision, I am satisfied that this portion of U S West's fourth claim should not be dismissed.

### e) *Motion to dismiss fifth claim*

U S West's fifth claim challenges the mechanism for cost recovery related to interim number portability set out in the Agreement. "Number portability" is defined in the Act as "the ability of users of telecommunication services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another." 47 U.S.C. § 153(30). The Act accords the FCC the authority to prescribe rules and regulations concerning number portability.

TCG contends that U S West cannot prevail on its fifth claim because it agreed to the provision of which it now complains, and because the provision in question tracks a binding FCC Number Portability Order that is subject to review only by a United States Court of Appeals. As to the former of these contentions, I note that U S West has alleged that the Commission and the arbitrator rejected its argument that interim number portability should be fixed according to a "cost-based rate." As to the latter contention, I am satisfied that U S West is entitled to challenge the application of the FCC Order to the Agreement, even if that Order permitted application of the method used by the Commission in establishing the challenged provision. Section 252(e)(6) of the Act grants aggrieved parties the right to obtain judicial review to determine whether an agreement complies with the Act. Certainly, appellate courts are granted exclusive jurisdiction to review FCC Orders. 28 U.S.C. § 2342(1). Here, however, U S West has neither named the FCC as a defendant nor sought review of an FCC order. Instead, it seeks the judicial review explicitly provided under Section 252(e)(6). Under these circumstances, the motion to dismiss the fifth claim should be denied.

### f) *Motion to dismiss sixth claim*

The Act requires an incumbent LEC to allow requesting telecommunications carriers to place certain equipment at the LEC's premises. This requirement is referred to as "physical collocation." U S West's sixth claim alleges that the Agreement requires it to permit collocation of TCG's facilities at any technically feasible point, "including its central offices, service wire centers and tandem offices, as well as all buildings or similar structures owned or leased by U S West that house its network facilities, whether or not collocation at that point is necessary to permit TCG to interconnect or to obtain access to unbundled elements." This claim alleges that Section 251(c)(6) of the Act does not require such broad collocation.

Section 251(c)(6) specifies that incumbent LECs shall provide "for physical collocation of equipment necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier. . . ." TCG contends that this section must be interpreted in conjunction with Sections 251(c)(2) and (3). Section 251(c)(2) provides in part that LECs must provide interconnection "at any technically feasible point within the carrier's network," and Section 251(c)(3) provides in part that LECs must provide for "access to network elements on an unbundled basis at any technically feasible point. . . ." TCG contends that these latter sections set out the requirement relating to *where* interconnection and access must be provided (that is, "at any technically feasible point,") while Section 251(c)(6) describes the *equipment* that the LECs must collocate, that is "equipment necessary for interconnection or access to unbundled network elements." It argues that the phrase "necessary for interconnection or access to unbundled network elements" in Section 251(c)(6) modifies the term "equipment," and "does not purport to describe *where* collocation is to occur."

I am not persuaded that TCG's reading of these sections is the only reasonable, logical, or plausible interpretation of these provisions. At this point, I do not know whether the "interconnection" and "access" specified under Sections 251(c)(2) and (3) would necessarily require the collocation of a competi-

tor's equipment, or whether U S West could effect the interconnection through some other mechanism. TCG's contention that Section 251(c)(6) does not describe where collocation is to occur is also unpersuasive. This section provides for physical collocation of equipment "at the premises of the local exchange carrier...." Though "premises" is not further defined, it appears that the term may well mean something different than the reference to "any technically feasible point" in the other potentially relevant sections.

Under these circumstances, U S West's inability to establish a right to recover under its sixth claim is not beyond doubt. I therefore deny the motion to dismiss this claim.

### g) *Motion to dismiss seventh claim*

U S West's seventh claim alleges that the Agreement unlawfully deprived it of property without due process of law. This claim alleges that the Commission defendants "improperly adopted or relied on the FCC Order and the rules promulgated therein, failed to take into account the overriding provisions of the Act, and acted arbitrarily." The claim further alleges that the Commission defendants lacked the authority to impose provisions that were not supported by the record, and that they "unlawfully adopted the Agreement with provisions that are inconsistent with the record evidence."

TCG contends that this claim must fail because the complaint and attached documents establish that U S West was accorded the notice and right to be heard that due process requires. However, notice and a right to be heard are not the focus of U S West's due process claim. Instead, at the core of U S West's due process claim are allegations that the Commission defendants acted arbitrarily and imposed provisions that were unsupported by evidence in the record. In addition to requiring that one threatened with a loss of property be provided notice and an opportunity to be heard, due process requires that the decision be made by a reasonable decision maker who does not act arbitrarily or capriciously, and who bases the decision upon the evidence presented. *See, e.g., Jordan v. City of Lake Oswego,* 734 F.2d 1374, 1376 (9th Cir.1984). U S West's allega-

tion that the Commission defendants arbitrarily deprived it of property without the support of evidence in the record at least states a due process violation claim. Accepting these allegations as I must in analyzing a motion to dismiss for failure to state a claim, I deny the motion to dismiss this claim.

### CONCLUSION

The United States' and the FCC's motion to intervene (# 29) is GRANTED. The Oregon PUC's and PUC Commissioners' motion to dismiss (# 12) is DENIED. TCG's motion to dismiss (# 15) is GRANTED as to subparts 1 and 2 of the fourth claim, and is DENIED as to the balance of the claims against which TCG has moved.