**BELLSOUTH TELECOMMUNICATIONS, INC., d/b/a Southern Bell Telephone and Telephone Company/South Central Bell, Plaintiff,**

v.

**Robert KERRIGAN, George W. Estess, and 811, Inc., Defendants.**

No. 3:97CV554.

United States District Court,
N.D. Florida,
Pensacola Division.

May 28, 1999.

*Let Judges be Judges. Downward Departures* *After Koon,* 12 Criminal Justice 49 (1998).

Scott A Markowitz, Heinrich Gordon Hargove Etc., FT Lauderdale, Cathy J Goodwin, Heinrich Gordon Hargrove Etc, Orlando, for plaintiff.

Dennis K. Larry, Clark Partington Hart Etc., Pensacola, David Lafuria, Lukas Nace Gutierrez Etc., Washington, DC, Damian Christopher Taylor, Clark Partington Etc., Pensacola, for defendants.

## ORDER

VINSON, Chief Judge.

Pending is the plaintiff's motion for summary judgment. (doc. 48) Also pending is the defendants' motion for partial summary judgment. (doc. 79)

## I. BACKGROUND

In 1992, plaintiff BellSouth Telecommunications, Inc. ("BellSouth") introduced a new "N11" service in the state of Florida. The N11 service is a three-digit local dialing arrangement available in specified areas for the delivery of general information over the telephone. BellSouth made available for assignment in specified areas the N11 telephone numbers 211, 311, 511, 711, and 811. N11 Subscribers who contracted with BellSouth and were assigned an N11 number could provide information services and charge end users for calls, while BellSouth would record and rate the calls on behalf of the subscribers. Only one N11 number could be assigned to an N11 subscriber per local calling area. The intended target market for the service consisted of subscribers making available on a pay-per-call basis such information as sports scores, weather, time, stock quotes, and classified services. Service in Florida was to be offered in specified local calling areas, with area designations ranging from Tier 1 (highly-populated areas) to Tier 4 (the least-populated areas).

The various telephone services provided by BellSouth in Florida are governed by the Florida General Subscriber Service Tariff ("Tariff"), as approved by the Florida Public Service Commission ("PSC"). BellSouth filed a modification to the Tariff consisting of Section A.39, a section that set forth the service requirements and conditions of N11 abbreviated dialing. (doc. 48, ex. D) The Florida Public Service Commission approved the A.39 tariff on November 4, 1992. (doc. 48, ex. E)

In 1994, defendant Robert Kerrigan and his partner, defendant George Estess, decided to apply to BellSouth for the ability to provide N11 service in multiple regions in the state of Florida. The defendants requested "811" as their three digit dialing code. The defendants signed letters of agreement with BellSouth for seven N11 lines in Florida, and received copies of the BellSouth General Service Subscriber Tariff, which was incorporated into the agreements by reference. The defendants incorporated 811, Inc. for the purpose of operating the N11 business. To provide information to callers, the defendants ordered a satellite-based information system, and hardware was installed in several locations in Florida.

Under the Tariff, a "minimum usage charge" is incurred by an N11 provider if six months after the N11 line is installed, the line usage has not risen to a specified level. The parties dispute whether the charge is a one-time charge or a monthly charge. In 1995, the plaintiff billed the defendants monthly for minimum usage charges on all the N11 sites operated by the defendants. The defendants paid the charge for one month for each site. (Miller dep., at 40–41) The plaintiff billed the defendants for minimum usage charges for subsequent months on the sites, and the defendants refused to pay the charges on the basis that the minium usage charge was a one-time charge, rather than a monthly charge.

BellSouth continued to apply minimum usage charges to 811, Inc., and after five months of non-payment BellSouth informed 811, Inc. that service would be disconnected if the balance owed was not immediately paid. On May 30, 1996, an attorney for BellSouth sent 811, Inc. a letter stating that according to BellSouth's interpretation of the tariff, 811, Inc. was required to pay minimum usage charges for every period in which 811, Inc. fell below the minimum usage charges, and that 811, Inc. had an outstanding balance of $85,474. (doc. 48, ex. K) The telephone lines were eventually disconnected on the basis that 811, Inc. had made no arrangements to pay the outstanding balance.

The plaintiff filed the present action on December 29, 1997, and filed an amended complaint on May 21, 1998. (doc. 27) Count I alleges breach of contract. Count II, entitled "Statement of Account," alleges that the defendants owe the plaintiff $107,-730.28 and $14,608.39 on two accounts. In their counterclaim, the defendants alleged that plaintiff breached the N11 agreements by improperly cutting off the defendant's N11 service without prior notice.

## II. ANALYSIS

### A. Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); *see also Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987).

However, summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact." *Cornelius v. Highland Lake,* 880 F.2d 348, 351 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.; see also Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986).

Conclusory allegations based on speculation, subjective beliefs, or bald assertions based upon unsubstantiated hearsay are insufficient to create a "genuine issue of material fact." *Carter v. Miami,* 870 F.2d 578, 585 (11th Cir.1989); *Ramsey v. Leath,* 706 F.2d 1166, 1170 (11th Cir.1983). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. *McCabe v. Sharrett,* 12 F.3d 1558, 1560 (11th Cir.1994). If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, then summary judgment is appropriate. *Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986).

### B. Discussion

#### (1) Plaintiff's Motion for Summary Judgment on Defendant's Counterclaim

In their counterclaim, the defendants allege that the plaintiff breached the Florida General Subscriber Service Tariff and the agreements with the defendants when the plaintiff improperly cut off the defendants' N11 service access without right or justification and without proper notice. The Tariff provides that:

Unless otherwise specifically provided in this Tariff, the Company shall be authorized to disconnect any tariffed service provided to the N11 subscriber utilized, directly or indirectly, with the N11 Service which fails to comply with regulation and conditions set forth herein, upon five (5) days notice to the subscriber. Disconnection may be suspended at the discretion of the Company if it receives written certification that the N11 subscriber is in compliance with regulations and conditions of the tariffs. Continual noncompliance shall be cause for

disconnection without notice at the discretion of the Company.

According to the plaintiff, it is entitled to summary judgment on the defendants' counterclaim because the counterclaim is barred by the limitation of liability clause in the Tariff.

The plaintiff entered into seven separate agreements for N11 service with the defendants, with each agreement addressing a separate service location. Each agreement contains a paragraph which states that 811, Inc.:

> [A]grees to the rules and regulations for the provision of N11 service as set out in Section A.39 of the Florida General Subscriber Service Tariff.

(doc. 48, ex. F) The agreements also provide that:

> 811, Inc. further agrees to abide by any subsequent rules adopted by the FCC regarding the use and return of N11 service codes.

(doc. 48, ex. F) The General Subscriber Service Tariff in effect at the time the agreements were signed provides:

> In no event shall the Company be liable for any losses or damages of any kind resulting from the unavailability of its equipment or facilities or for any act, omission or failure of performance by the company, or its employees, or agents, in connection with this tariff. The Company shall not be responsible for calls that cannot be completed as a result of repair or maintenance difficulties on company facilities and equipment. Nor on equipment owned or leased by the subscriber.

Section A.39.1.2(J). According to the plaintiff, under the filed rate doctrine, the limitation of liability clause must be interpreted as barring the defendants' claim for damages resulting from termination of service.

■■ The filed rate doctrine "recognizes that where a legislature has established a scheme for utility rate-making, the rights of the rate-payer in regard to the rate he pays are defined by that scheme." *Taffet v. Southern Co.*, 967 F.2d 1483, 1490 (11th Cir.1992). The filed rate doctrine applies whether the rate in question is approved by a federal or state agency. *Id.* at 1494; *Wegoland v. NYNEX Corp.*, 27 F.3d 17 (2d Cir.1994); *H.J., Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 494 (8th Cir.1992). Application of the filed rate doctrine can at times be harsh, but the doctrine's justification lies in the principle that the tariff must be uniformly applied in a non-discriminatory manner so that similarly situated customers pay the same rates for the same service. *See American Tele. & Telegraph Co. v. Central Office Tele., Inc.*, 524 U.S. 214, ——, 118 S.Ct. 1956, 1963, 141 L.Ed.2d 222 (1998). The filed rate is a matter of public knowledge and the customer is assumed to know the filed rate. A tariff filed with a regulatory agency has the force and effect of law as to services arising under it, and supersedes all other agreements between the parties. *See Vendola v. Southern Bell Telephone & Telegraph Co.*, 474 So.2d 275, 278 (Fla. 4th DCA 1985); *MCI Telecomm. Corp. v. Best Tel. Co.*, 898 F.Supp. 868, 872 (S.D.Fla.1994). The utility that files the rate cannot be held liable for any representations contrary to the tariff. *Taffet*, 967 F.2d at 1487; *Marco Supply Co. v. AT & T Communications, Inc.*, 875 F.2d 434, 435–36 (4th Cir.1989). Once the tariff is approved, "the rate must be charged and paid regardless of mistake, inadvertence or contrary intention of the parties." *American Transp. Lines, Inc. v. Wrves*, 985 F.2d 1065, 1067 (11th Cir.1993) (citation omitted).

■■ The defendants contend that the clause is an unenforceable exculpatory clause under Florida law. Under Florida law, "[c]ontractual provisions by which a party seeks exculpation for his own negligence, although not favored in the law, have been upheld as not violative of public policy where the contract is between persons of equal bargaining power and the provisions are clear and unambiguous."

*Hardage Enterprises, Inc. v. Fidesys Corp. .*, 570 So.2d 436, 439 (Fla. 5th DCA 1990) (citations omitted); *Mankap Enterprises, Inc. v. Wells Fargo Alarm Services, Inc.*, 427 So.2d 332 (Fla. 3d DCA 1983). The Florida courts have upheld exculpatory clauses against claims for consequential losses based on negligence and breach of contract claims. *Greater Orlando Aviation Authority v. Bulldog Airlines, Inc.*, 705 So.2d 120 (Fla. 5th DCA 1998); *Continental Video Corp. v. Honeywell, Inc.*, 422 So.2d 35 (Fla. 3d DCA 1982); *L. Luria & Son v. Honeywell, Inc.*, 460 So.2d 521 (Fla. 4th DCA 1984). An exculpatory clause also does not protect against claims of willful, malicious, or grossly negligent conduct. *See, e.g., Southworth & McGill, P.A. v. Southern Bell Tel. & Tel. Co.*, 580 So.2d 628, 631 (Fla. 1st DCA 1991); *Willhite v. South Central Bell Tel. Co.*, 693 F.2d 340, 343 (5th Cir.1982) (applying Louisiana law).

The defendants rely upon *Sniffen v. Century Nat'l Bank of Broward*, 375 So.2d 892 (Fla. 4th DCA 1979), and *Ivey Plants, Inc. v. FMC Corp.*, 282 So.2d 205 (Fla. 4th DCA 1973). In *Sniffen*, the plaintiff filed a complaint against the defendant bank alleging that the bank negligently permitted an unauthorized person to have access to his safety deposit box. The trial judge dismissed the complaint on the ground that an exculpatory provision in the safety deposit box agreement barred the action. On appeal, the Florida Fourth District Court of Appeal reversed, on the basis that application of the exculpatory clause would render the agreement "entirely nugatory," because if a customer could not enforce the bank's undertaking to preclude unauthorized access to the box, the customer would "have received nothing whatsoever in return for his rental fee." *Id.* at 894. The court relied on its prior decision in *Ivey Plants, Inc. v. FMC Corp., supra,* in which the court held that the requirements of mutuality of obligation and mutuality of remedy rendered an exculpatory clause unenforceable where the clause would prevent all recovery of damages for the breach of a contractual undertaking in a lease. *Ivey Plants, Inc.*, 282 So.2d at 208.

■ In contrast to the exculpatory clauses at issue in *Sniffen* and *Ivey Plants*, the limitation of liability clause at issue here is contained in a tariff. A limitation of liability clause in a tariff is an essential and valid part of the rate, and serves the public interest by allowing lower utility rates. *See Landrum v. Florida Power & Light Co.*, 505 So.2d 552, 553 (Fla. 3d DCA 1987); *Computer Tool & Engineering, Inc. v. Northern States Power Co.*, 453 N.W.2d 569 (Minn.App.1990). The courts have held that limitation of liability provisions in tariffs bar claims for simple negligence and breach of contract. *Landrum v. Florida Power & Light Co.*, 505 So.2d at 554 (negligence); *Bulbman, Inc. v. Nevada Bell*, 108 Nev. 105, 825 P.2d 588, 590 (1992) (breach of contract); *Simpson v. Phone Directories Co.*, 82 Or.App. 582, 729 P.2d 578, 580 (1986); *Willhite v. South Central Bell Telephone, Inc.*, 693 F.2d 340 (5th Cir.1982); *Greyhound Lines, Inc. v. Mah*, 216 Va. 401, 219 S.E.2d 842, 844 (1975). The limitation of liability clause in the plaintiff's tariff is enforceable, and is not an invalid exculpatory clause. This is not the end of the inquiry, however.

■ The defendants contend that even if the limitation of liability clause in Section A.39.1.2(J) of the tariff is enforceable, it does not apply to the plaintiff's conduct. The defendants contend that while Section A.39.1.2(J) limits liability for unavailability of equipment, acts or omissions or failure of performance in connection with the tariff, and for calls that cannot be completed due to maintenance, it does not limit liability for the plaintiff's intentional discontinuance of its services to the defendants without five days notice.

The essence of the defendants' counterclaim is that the plaintiff cut off the defendants' N11 service without giving the notice required by the tariff. The tariff specifically provides that the plaintiff must give five days notice to the subscrib-

er before disconnecting N11 service, unless "continual noncompliance" gives the plaintiff cause to disconnect service without notice. Under the filed rate doctrine, the plaintiff was required to comply with this tariff provision when disconnecting the defendants' service. Although the limitation of liability clause is valid and enforceable, it has no application to the obligation of the plaintiff to comply with the notice provision of its own tariff, and does not prevent the defendants from bringing a counterclaim based on the alleged failure to give the notice required by the tariff.

The plaintiff contends that it was it was permitted to disconnect the defendants' service without notice because of the defendants' continued non-compliance with the terms of the tariff; specifically, the defendants' obligation to pay the minimum usage charges. In its statement of facts, the plaintiff states that the plaintiff contacted the defendants after five months of non-payment of the charges and informed the defendants that service would be interrupted if payment was not made. As support for this statement, the plaintiff has submitted the printout of a screen from the plaintiff's computerized billing system, which is largely in code, but which indicates that the defendants were contacted by telephone regarding the outstanding fees. (doc. 48, ex. 1)

The plaintiff and defendants have also submitted correspondence between the parties. A letter dated April 4, 1996, from defendant Kerrigan to Ruth Margolis, a senior account executive for the plaintiff, disputes the plaintiffs' interpretation of the minimum usage charge as a monthly charge. (doc. 62, ex. 3) On May 15, 1996, Kerrigan sent a letter to Margolis noting that Margolis had failed to reply to his previous letter, stating that service in Jacksonville had been disconnected, and enclosing two bills that had been sent to the defendants by the plaintiff. (doc. 62, ex. 3) Kerrigan wrote a letter to Dave Sczuka, an employee of the plaintiff, on May 20,

1996, stating that service in Jacksonville had been disconnected, and that the defendants were "now receiving notice by Bell South that each of our seven market accounts are being targeted for service interruption" on the basis of non-payment of the minimum usage charges. (doc. 62, ex. 3) In the letter, Kerrigan also referred to the continual threat of disconnection as jeopardizing the parties' relationship.

In another letter from Kerrigan to Margolis dated May 31, 1996, Kerrigan stated that the defendants could not operate under a threat of discontinued service, and also stated that the defendants could not and would not pay the monthly minimum charges disputed by the defendants. (doc. 62, ex. 3) Hugh Dye, an attorney for the plaintiff, wrote a letter to the defendants on May 30, 1996, in which Dye stated that the defendants were required by the tariff to pay the minimum usage charges on a monthly basis, and that the defendants needed to contact the plaintiff by June 7, 1996, to make arrangements to pay the outstanding balance of $85,474. (doc.48, ex. K)

In a letter sent from Kerrigan to Dye dated June 10, 1996, Kerrigan stated that the defendants had remitted one monthly minimum payment for each of the defendants' N11 markets, and that interruption of service was an act in bad faith. (doc. 62, ex. 3) Defendant Kerrigan wrote another letter to Dye on June 13, 1996, in which he stated that the plaintiff's interpretation of the tariff was illogical, and noted that if the plaintiff refused to reconsider its position the defendants would be forced to discontinue service to their customers. (doc. 62, ex. 3) Dye wrote a short letter to the defendants on June 20, 1996, stating that the plaintiff would stand by its interpretation of the tariff. (doc. 62, ex. 3) Hugh Dye wrote another letter to the defendants on June 27, 1996, in which he stated that while the account had been terminated, the defendants could reestablish service by satisfying the account in full and paying new installation charges by

July 26, 1996, with failure to do so resulting in the transfer of the N11 numbers to a new entity. (doc. 59, ex. 1)

Renee Miller, who worked as the business administrator for the defendants, testified that she could not recall the defendants receiving a written notice from the plaintiff stating that disconnection would occur by a certain date if the charges were not paid. (Miller dep., at 66) Miller testified that she first became aware of the monthly minimum charges in November 1995, when Kerrigan instructed her not to pay the monthly minimum charges. (Miller dep., at 32–34) When Miller informed Kerrigan that the charges were being billed to the defendants, Kerrigan stated that he did not believe the minimum charges were owed. (Miller dep., at 34) At some point, the plaintiff told Miller that service would be cut off if the bills were not paid. (Miller dep., at 39)

 There is no evidence in the record showing that the plaintiff gave the defendants the five days notice required by the tariff before disconnecting the defendants' N11 service. The issue becomes whether "continual noncompliance" gave the plaintiff cause to disconnect service without notice. The evidence in the record shows that the defendants were aware that they were expected to pay the monthly minimum charges on a monthly basis, and that the plaintiff billed the defendants for the charges on several occasions before the defendants' N11 services were disconnected. Without any question, non-payment is noncompliance. However, it is not clear from the record whether the plaintiff exercised its discretion to disconnect service without notice, or whether the plaintiff simply failed to give the five days notice required by the tariff. It is also not clear exactly when service was disconnected in Jacksonville and in the defendants' other locations. Because genuine issues of material fact remain concerning the issue of notice, the plaintiff's motion for summary judgment must be DENIED.

**(2) Defendants' Motion for Partial Summary Judgment**

The plaintiff alleges in its amended complaint that the defendants breached their agreements with the plaintiff by failing to pay the minimum usage charges under the Tariff. The defendants contend that they are entitled to judgment as a matter of law on the plaintiff's claims for recovery of minimum usage charges relating to service before April 16, 1996.

Section A.39.1.6.A.5 of the Tariff provides:

A Minimum Usage Charge will be billed to the N11 subscriber in each billing period, following the 6–month period after the service has been provisioned, in which the N11 subscriber's usage charges fall below the amount of the Minimum Usage Charge in B.5. following.

Section A.39.1.6.B.5 bears the heading "Minimum Usage Charge, per N11 Service Number, per Local Calling Area," and under a column labeled "Nonrecurring Charge," lists the charges applicable to each service area tier. The charges listed were: (1) $10,000 for Tier 1; (2) $5,000 for Tier 2; (3) $3,000 for Tier 2; and (4) $2,000 for Tier 4. Effective April 16, 1996, Section A.39.1.6 was revised to provide new lower rates. Revised Section A.39.1.6.B.5 no longer listed minimum usage charges under "Nonrecurring Charges," but listed the charges in a column labeled "Monthly Minimum Charge."

According to the defendants, before the revision, Section A.39.1.6 was ambiguous as to whether the minimum usage charge was a one-time charge or a continuing charge. The defendants contend that the ambiguity must be construed against the plaintiff, the entity that drafted the tariff.

The construction of a tariff ordinarily presents a question of law. *Bella Boutique Corp. v. Venezolana Internacional de Aviacion, S.A.*, 459 So.2d 440, 442 (Fla. 3d DCA 1984).

Although any ambiguity in a tariff should be construed against the carrier, such ambiguity or doubt must be a reasonable one. There must be a substantial and not mere arguable basis in order to justify resolving the doubt against the carrier .... The terms of a tariff should be given their ordinary meaning, and strained or unnatural constructions are not permitted.

*Bella Boutique,* 459 So.2d at 442.

Section A.39.1.6.A.5 of the Tariff states that following the six month period after service has been provisioned, a minimum usage charge will be billed to the subscriber "in each billing period" in which the usage charges fall below the amount of the minimum usage charge. The parties do not dispute that under this language, the minimum usage charge would be a continuing charge. The defendants' argument of ambiguity is based on the fact that in the list of charges that follows Section A.39.1.6.A.5, the minimum usage charges are listed under the subheading "Nonrecurring Charge." According to the defendant, the plain meaning of the term "nonrecurring charge" is that the minimum usage charge would only be charged one time as to each of a provider's individual calling areas. The plaintiff contends that in the telecommunications industry, the term "nonrecurring charge" can include charges that are not necessarily assessed in every billing cycle, but that can be assessed more than one time.

■ An initial issue is whether the doctrine of primary jurisdiction applies in this case.

Primary jurisdiction "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body."

*MCI Telecommunications Corp. v. Teleconcepts, Inc.,* 71 F.3d 1086, 1103 (3d Cir.

1995). *See Humana of Florida, Inc. v. McKaughan,* 652 So.2d 852, 860 (Fla. 2d DCA 1995); *Access Telecommunications v. Southwestern Bell Tel. Co.,* 137 F.3d 605 (8th Cir.1998); *Rebel Motor Freight, Inc. v. Interstate Commerce Comm'n,* 971 F.2d 1288 (6th Cir.1992). Thus, under the doctrine of primary jurisdiction a court may leave an issue for agency determination when it involves the special expertise of the agency and would impact the uniformity of the regulated field. *See Hill Top Developers, v. Holiday Pines Service Corp.,* 478 So.2d 368, 370 (Fla. 2d DCA 1985); *DeBruce Grain, Inc. v. Union Pacific R. Co.,* 149 F.3d 787 (8th Cir.1998). The doctrine does not apply if the tariff's language is used in its ordinary sense, or if the question is not intertwined with technical facts. *Humana of Florida, Inc. v. McKaughan,* 652 So.2d at 860; *Milne Truck Lines, Inc. v. Makita USA, Inc.,* 970 F.2d 564, 567 (9th Cir.1992).

■ In this case, the term "nonrecurring charge" must be interpreted. Although the plaintiff has presented evidence that the term has a special meaning in the telecommunications industry, the issues of interpretation are not overly technical or complex. Primary jurisdiction does not extend to a legal question that "is within the conventional competence of the courts, and the judgment of a technically expert body is not likely to be helpful in the application of these standards to the facts of the particular case." *National Communications Ass'n, Inc. v. American Tel. & Tel. Co.,* 46 F.3d 220, 223 (2d Cir.1995). The doctrine of primary jurisdiction does not require referral of this case to the Florida Public Service Commission. I note, however, that the Commission's approval of the tariff and its various provisions, as well as its subsequent approval of the amended tariff without any revenue adjustments, is indicative that it construed the term as applying to each billing cycle.

According to the plaintiff, within the telecommunications industry, the term "nonrecurring charge" is sometimes used

to refer to charges or fees that do not necessarily occur in *every* billing cycle, in contrast to "recurring charges," such as monthly residential phone service fees, that are charged in every billing cycle. Martha Johnson, the employee of the plaintiff who drafted the tariff, testified at her deposition that the minimum usage charge was a nonrecurring charge, in that while the charge might be applied one month because of failure to meet the monthly minimum, it would not be applied the next month if the N11 provider met the minimum requirement. (doc. 86, ex. 1) Other employees of the plaintiff gave similar definitions of "nonrecurring charge." *(See* doc. 86, ex. 3, ex. 8) The plaintiff also relies on the affidavit of Robin Norton, a communications consultant for Technologies Management, Inc., and a former employee of the Florida Public Service Commission. Norton states that the minimum usage charge "is properly classified as a non-recurring charge because it is a contingency charge that is assessed only when a certain condition is met, in this case, when the monthly usage falls below the minimum amount." (doc. 86, ex. 23)

In response to the evidence presented by the plaintiff, the defendants point to the deposition testimony of Martha Johnson that "[n]onrecurring does mean a one-time fee but I think it's also appropriate for the minimum usage charge." (doc. 81, Johnson dep., at 34) She further explained that:

A. A nonrecurring charge is one that applies on a one-time basis as it's defined. And the minimum usage charge was defined as a charge that would be calculated on a monthly basis but not charged on a monthly basis. A monthly charge implies that it is charged month after month after month. The nonrecurring charge is a one-time charge. If a customer didn't meet their monthly minimum one month we would charge the nonrecurring charge. If they met it the next month it would not apply.

Q. And if the subscriber month after month after month failed to meet the minimum they would be charged a nonrecurring charge month after month after month, in effect, becoming a recurring charge?

A. Calculated on a month-to-month basis, yes.

(doc. 81, Johnson dep., at 35) Johnson testified that in other parts of the tariff at issue, the term "nonrecurring" meant a charge that is truly a one-time charge, such as a charge for installation of new service. (doc. 81, Johnson dep., at 34) Thomas Williams, the plaintiff's product manager for N11 service, testified that nonrecurring "means a charge that doesn't appear repeatedly on a continuous basis, usually monthly." (doc. 81, Williams dep., at 26)

The defendants rely on the plaintiff's use of the term "nonrecurring charge" in other contexts, such as a tariff unrelated to this case which defines "nonrecurring charges" as one-time charges that apply for a specific work activity, such as the installation of a new service or a change to a new service. (doc. 79, ex. 6) The defendants also note that after Kerrigan questioned the plaintiff as to why the minimum usage charge was termed a "nonrecurring charge" in the tariff, the plaintiff made an amendment to the tariff in Florida and in other states and changed the term "nonrecurring charge" to "monthly minimum charge." Sandy Sanders, the BellSouth employee responsible for ensuring that the change was made, testified that the issue arose when a customer questioned BellSouth about the use of the term in connection with the usage charge. (Sanders dep., at 5) Sanders' team concluded that the term could be confusing to customers. Sanders testified that "[t]he tariff was correct. But to further clarify the true meaning of the tariff we decided to make the change at the next appropriate tariff revision." (Sanders dep., at 10)

■ The common meaning of a tariff term is a question of law. *Bella Boutique Corp. v. Venezolana Internacional de Aviacion, S.A.,* 459 So.2d 440, 442 (Fla.

3d DCA 1984); *United States v. Godinez,* 922 F.2d 752, 753 (11th Cir.1991). The terms of a tariff should be given their ordinary meaning, and strained or unnatural constructions are not permitted. *Bella Boutique Corp.* 459 So.2d at 442. *See Godinez,* 922 F.2d at 753 (in absence of evidence to the contrary, meaning of tariff term is presumed to be its common or dictionary meaning). In interpreting a term in a tariff, a court may rely on its own understanding of the term or assist its understanding with "works of standard lexicographers, scientific authorities, the testimony of witnesses, or by such other means as may be available." *Godinez,* 922 F.2d at 754 (citation omitted). *See West Bend Co. v. United States,* 892 F.2d 69, 72 (Fed.Cir.1989); *United States v. Patel,* 762 F.2d 784, 791 (9th Cir.1985).

The term "nonrecurring" is commonly understood to mean an event that occurs only one time. This common meaning applies to certain charges listed as "nonrecurring" by telephone companies such as the defendant, including installation charges for telephone service, which are typically only charged one time. *See, e.g., U.S. West Communications, Inc. v. TCG Oregon,* 35 F.Supp.2d 1237 (D.Or.1998) ("Nonrecurring charges are one-time fees imposed for establishing particular services, such as the charge a customer pays to have telephone service established."). The term "nonrecurring charge" clearly has this meaning when used at various points in the tariff at issue, such as the provision stating that the N11 provider will be billed a nonrecurring charge for setup of the N11 service. (doc. 48, att., at p. 2.1) The evidence in the record shows that the term "nonrecurring charge" can also refer to charges that do not necessarily recur every month, but that are assessed when a certain contingency occurs. *(See* doc. 86, ex. 1, ex. 3, ex. 8) Depending on whether and with what frequency the contingency occurs, the charge could be assessed periodically, at sporadic intervals, or on a one-time basis. (doc. 81, Johnson dep., at p. 35)

In the Tariff, the charges for Tier 1, 2, 3, and 4 are under the main heading "Minimum Usage Charge, per N11 Service Number, per Local Calling Area," and the subheading "Nonrecurring Charge" is located directly over the column of money amounts. If considered by itself, the subheading "Nonrecurring Charge" is ambiguous, in that it has two distinct meanings. However, when considered in context, the subheading is not ambiguous. The main heading bearing the words "Minimum Usage Charge" is referred to at the top of the same page, where Section A31.1.6.A.5 explains that "[a] Minimum Usage Charge will be billed to the N11 subscriber *in each billing period,* following the 6–month period after the service has been provisioned, in which the N11 subscriber's usage charges fall below the amount of the Minimum Usage Charge in B.5. following." (emphasis added). That section clarifies that the frequency of the charge depends on whether and when the contingency (insufficient amount of usage) occurs. Therefore, the term "nonrecurring charge," as used in this particular subheading, is not ambiguous when read in context with all the associated language of the tariff. Because the tariff before its revision on April 16, 1996, unambiguously provided that the minimum usage charge was applicable each billing period and was not just a one-time charge, the defendants are not entitled to summary judgment.

### III. CONCLUSION

The plaintiff's motion for summary judgment is DENIED. (doc. 48) The defendants' motion for partial summary judgment is also DENIED. (doc. 79)